JS 44   (Rev. 06/17) FLSD Revised 06/01/2017

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*   NOTICE: Attorneys MUST Indicate All Re-filed Cases Below.

## I. (a) PLAINTIFFS
UNITED STATES SUGAR CORPORATION

### DEFENDANTS
LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commanding General and Chief of Engineers for the United States Army Corps of Engineers; COLONEL ANDREW KELLY, in his official capacity, et al

**(b)** County of Residence of First Listed Plaintiff  Hendry County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant  Washington, D.C.
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:      IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
RICK J. BURGESS, ESQ, GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre, 450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL  33301-4206; Telephone: 954-468-1363

Attorneys *(If Known)*

**(d)** Check County Where Action Arose:  ☐ MIAMI- DADE  ☐ MONROE  ☐ BROWARD  ☒ PALM BEACH  ☐ MARTIN  ☐ ST. LUCIE  ☐ INDIAN RIVER  ☐ OKEECHOBEE  ☐ HIGHLANDS

## II. BASIS OF JURISDICTION   *(Place an "X" in One Box Only)*

☐ 1  U.S. Government
Plaintiff

☐ 3  Federal Question
*(U.S. Government Not a Party)*

☒ 2  U.S. Government
Defendant

☐ 4  Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff)*
*(For Diversity Cases Only)*                          and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT   *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions

### CONTRACT
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

### REAL PROPERTY
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

### TORTS
**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Med. Malpractice

### CIVIL RIGHTS
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 448 Education

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

### PRISONER PETITIONS
**Habeas Corpus:**
- ☐ 463 Alien Detainee
- ☐ 510 Motions to Vacate Sentence

**Other:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee – Conditions of Confinement

### FORFEITURE/PENALTY
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

### LABOR
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

### IMMIGRATION
- ☐ 462 Naturalization Application
- ☐ 465 Other Immigration Actions

### BANKRUPTCY
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

### PROPERTY RIGHTS
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 835 Patent – Abbreviated New Drug Application
- ☐ 840 Trademark

### SOCIAL SECURITY
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

### FEDERAL TAX SUITS
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

### OTHER STATUTES
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729 (a))
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☒ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN   *(Place an "X" in One Box Only)*

☒ 1  Original Proceeding

☐ 2  Removed from State Court

☐ 3  Re-filed (See VI below)

☐ 4  Reinstated or Reopened

☐ 5  Transferred from another district *(specify)*

☐ 6  Multidistrict Litigation Transfer

☐ 7  Appeal to District Judge from Magistrate Judgment

☐ 8  Multidistrict Litigation – Direct File

☐ 9  Remanded from Appellate Court

## VI. RELATED/ RE-FILED CASE(S)
(See instructions):  a) Re-filed Case ☐ YES ☒ NO      b) Related Cases ☐ YES ☐ NO

JUDGE: Judge Donald M. Middlebrooks      DOCKET NUMBER: 2:19-cv-14199-DMM

## VII. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing and Write a Brief Statement of Cause *(Do not cite jurisdictional statutes unless diversity)*
NEPA 42 U.S.C. § 4321 et seq.; APA 5 U.S.C. § 706

LENGTH OF TRIAL via _____ days estimated (for both sides to try entire case)

## VIII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $ _____

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☐ Yes  ☒ No

ABOVE INFORMATION IS TRUE & CORRECT TO THE BEST OF MY KNOWLEDGE

DATE
August 1, 2019

SIGNATURE OF ATTORNEY OF RECORD
/s/ Rick J. Burgess

**FOR OFFICE USE ONLY**
RECEIPT # _____      AMOUNT _____      IFP _____      JUDGE _____      MAG JUDGE _____

JS 44   (Rev. 06/17)  FLSD Revised 06/01/2017

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed.  The attorney filing a case should complete the form as follows:

**I.**    (a) **Plaintiffs-Defendants.**  Enter names (last, first, middle initial) of plaintiff and defendant.  If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations.  If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence.  For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing.  In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing.  (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys.  Enter the firm name, address, telephone number, and attorney of record.  If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.**    **Jurisdiction.**  The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings.  Place an "X" in one of the boxes.  If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348.  Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question.  (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States.  In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.  Diversity of citizenship.  (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states.  When Box 4 is checked, the citizenship of the different parties must be checked.  (See Section III below; federal question actions take precedence over diversity cases.)

**III.**    **Residence (citizenship) of Principal Parties.**  This section of the JS 44 is to be completed if diversity of citizenship was indicated above.  Mark this section for each principal party.

**IV.**    **Nature of Suit**.  Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.**    **Origin**.  Place an "X" in one of the seven boxes.

Original Proceedings.  (1) Cases which originate in the United States district courts.

Removed from State Court.  (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.  When the petition for removal is granted, check this box.

Refiled (3) Attach copy of Order for Dismissal of Previous case. Also complete VI.

Reinstated or Reopened.  (4) Check this box for cases reinstated or reopened in the district court.  Use the reopening date as the filing date.

Transferred from Another District.  (5) For cases transferred under Title 28 U.S.C. Section 1404(a).  Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation.  (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.  When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment.  (7) Check this box for an appeal from a magistrate judge's decision.

Remanded from Appellate Court. (8) Check this box if remanded from Appellate Court.

**VI.**    **Related/Refiled Cases**.  This section of the JS 44 is used to reference related pending cases or re-filed cases. Insert the docket numbers and the corresponding judges name for such cases.

**VII.**    **Cause of Action**.  Report the civil statute directly related to the cause of action and give a brief description of the cause.  **Do not cite jurisdictional statutes unless diversity**. Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VIII.**    **Requested in Complaint**.  Class Action.  Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand.  In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand.  Check the appropriate box to indicate whether or not a jury is being demanded.

**Date and Attorney Signature**.  Date and sign the civil cover sheet.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| UNITED STATES SUGAR CORPORATION | ) |
| | ) |
| | ) |
| | ) |
| *Plaintiff(s)* | ) |
| v. | ) |
| | ) |
| LIEUTENANT GENERAL TODD T. | ) |
| SEMONITE, in his official capacity as | ) |
| Commanding General and Chief of | ) |
| Engineers for the United States Army, et al. | ) |
| *Defendant(s)* | ) |

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

LIEUTENANT GENERAL TODD T. SEMONITE
U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

RICK J. BURGESS, ESQ.
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL  33301-4206
rburgess@gunster.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____

_____

*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| UNITED STATES SUGAR CORPORATION<br><br>_____<br>*Plaintiff(s)*<br>v.<br>LIEUTENANT GENERAL TODD T.<br>SEMONITE, in his official capacity as<br>Commanding General and Chief of<br>Engineers for the United States Army, et al.<br>_____<br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)  Civil Action No. |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

COLONEL ANDREW KELLY
U.S. Army Corps of Engineers
701 San Marco Boulevard
Jacksonville, FL 32207

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   RICK J. BURGESS, ESQ.
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL  33301-4206
rburgess@gunster.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____                    _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)*
_____ , a person of suitable age and discretion who resides there,
on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is
designated by law to accept service of process on behalf of *(name of organization)*
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Florida

| | |
|---|---|
| UNITED STATES SUGAR CORPORATION <br><br><br> _____ <br> *Plaintiff(s)* <br> v. <br> LIEUTENANT GENERAL TODD T. SEMONITE, in his official capacity as Commanding General and Chief of Engineers for the United States Army, et al. <br> _____ <br> *Defendant(s)* | ) <br> ) <br> ) <br> ) <br> ) <br> )   Civil Action No. <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

U.S. Army Corps of Engineers
441 G Street NW
Washington, DC 20314-1000

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   RICK J. BURGESS, ESQ.
GUNSTER, YOAKLEY & STEWART, P.A.
Las Olas Centre
450 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL  33301-4206
rburgess@gunster.com

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*CLERK OF COURT*

Date: _____          _____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❏ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

❏ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❏ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

❏ I returned the summons unexecuted because _____ ; or

❏ Other *(specify):*



My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .


I declare under penalty of perjury that this information is true.


Date: _____

_____
*Server's signature*

_____
*Printed name and title*


_____
*Server's address*

Additional information regarding attempted service, etc:

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

UNITED STATES SUGAR CORPORATION,

    Plaintiff,

-v-                                                                                Civil Action No.

LIEUTENANT GENERAL TODD T.
SEMONITE, in his official capacity as
Commanding General and Chief of
Engineers for the United States Army
Corps of Engineers;
COLONEL ANDREW KELLY, in his official
capacity as Commanding District Engineer for
the United States Army Corps of Engineers,
Jacksonville District; and
UNITED STATES ARMY CORPS OF
ENGINEERS,

    Defendants.

_____/

## <u>COMPLAINT</u>

### INTRODUCTION

1.     Plaintiff, United States Sugar Corporation ("USSC"), sues Defendants seeking

declaratory and injunctive relief and challenging the U.S. Army Corps of Engineers' ("Corps")

unreasonable actions in lowering the water level in Lake Okeechobee (the "Lake") without

analyzing the significant effects on the quality of the human environment.

2.     This action challenges the Corps' decisions to release water from Lake

Okeechobee at low Lake levels, contrary to the normal range of operations in the Lake

Okeechobee Regulation Schedule 2008 ("2008 Regulation Schedule"), and as summarized by the

Corps in its two Memoranda for the Record ("MFR") issued by the United States Army Corps of

1

Engineers, Jacksonville District, declaring its intent to release Lake water during low Lake levels.

3.     The Corps is charged with managing the level in the Lake for the benefit of all of south Florida.   The Lake level is integral to the health of the south Florida ecosystem and the water supply for the six million Floridians living and working south of the Lake, and is also integral to USSC's business.

4.     Wellfields for numerous municipalities along the lower east coast of Florida, including those located in Miami-Dade County, Broward County and Palm Beach County, depend on water from the Lake so they can provide water to residents and businesses, and the canals filled by the Lake provide water to hundreds of thousands of acres of farmland across south Florida.

5.     The Corps controls the Lake through a regulation schedule. The current Lake regulation schedule is known as the 2008 Regulation Schedule. This is the latest in a long series of Regulation Schedules the Corps has developed and used over the last 75 years to guide the decision making regarding releasing water from the Lake.

6.     The 2008 Regulation Schedule was finalized after the issuance of the 2007 Final Supplemental Environmental Impact Statement ("2007 EIS"). The 2008 Regulation Schedule was an interim schedule and was supposed to be in place for only three years.  Twelve years later, this interim schedule remains in place, relying on data and science generated in 2007 and before.

7.     The 2008 Regulation Schedule, among other things, constrains the Corps' decisions to release water from the Lake.  The 2008 Regulation Schedule contains high and low

lake levels, and regulates the Corps' decision-making at each of these levels to balance the water needs of south Florida.

8.      The 2008 Regulation Schedule establishes the ideal water levels for the Lake at between 12.5 feet and 15.5 feet. This range is considered ideal because it balances the various water needs of south Florida and the Lake.

9.      The Lake's levels rise and fall based on climate conditions, such as rain, and man-made water releases by the Corps.

10.     The Lake level is currently in the Water Shortage Band and is presently at 11.65 feet, which is below the ideal water levels fixed in the 2008 Regulation Schedule.[1] Despite this, and contrary to the 2008 Regulation Schedule, the Corps since November 2018 has been releasing unprecedented amounts of water from the Lake, driving the Lake to extreme low levels and man-made drought.

11.     Before the Corps' unprecedented release of water from the Lake, the Corps should have prepared a new or supplemental Environmental Impact Statement ("EIS") to update the 2008 Regulation Schedule and analyze the full effects that the Corps' unprecedented release of water would have on south Florida.  The Corps did not undertake an new or supplemental EIS prior to these releases of water.

12.     By releasing water since November 2018 resulting in the Lake at the low level of 11.65 feet without preparing an EIS and analyzing the full effects of that release of water, the

---

[1] The Water Shortage Band is the lowest portion of the 2008 Regulation Schedule. Lake stages enter this band between 13.0 and 10.5 feet, depending upon the time of year.  Depiction of the Water Shortage Band is found in **Exhibit A** and further described in the Water Control Plan for Lake Okeechobee and Everglades Agricultural Area, dated March 2008 at Section 7-08. The low Lake level is depicted with a blue line in **Exhibit B**.

Corps has violated the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 551 *et seq.*

13.     The Corps' draining of the Lake below the Water Shortage Band and the resulting man-made drought has "significantly" and adversely affected the quality of the human environment and will continue to do so.  These harmful effects include:

a.   a significant impact on public health and safety including negative effects on navigation and hurricane evacuation routes and safety threats to boaters getting stranded in a low Lake,

b.   a threat of peat fires and saltwater intrusion from a low Lake as a result of the unique characteristics of the geographic area,

c.   highly controversial effects, including wasting water, as evidenced by the many public comments the Corps received in public workshops requesting they not lower the Lake,

d.   uncertain, unique, and unknown risks arising from not knowing how low the Lake level will fall,

e.   setting a harmful precedent of the Corps operating outside of the 2008 Regulation Schedule for months at a time,

f.   the effects on cultural and historic resources were not analyzed,

g.   the adverse impacts on threatened and endangered species in that the endangered Everglade snail kite, for which the Lake is its critical habitat, and nesting has been virtually eliminated on the Lake this year, unlike last year where the Everglade snail kite nested approximately 161 times when water levels were in the normal range, and

4

h.   jeopardizing state law environmental protections because the Corps actions could trigger a violation of the State's law (Lake minimum flows and levels ("MFL")) on how low the Lake can go if the Lake remains below 11 feet for more than 80 days.

14.   By draining the Lake in violation of the 2008 Regulation Schedule, the Corps has, in effect, impermissibly created and implemented a new and rogue Lake regulation schedule, without preparing a new EIS, which is required to provide a robust analysis of the effects of the Corps' actions.

## PARTIES

15.   Plaintiff, USSC, owns and farms approximately 245,000 acres of farm lands in Glades, Hendry, Palm Beach and Martin counties.  USSC grows sugarcane, oranges, sweet corn, and winter vegetables, relying on Lake Okeechobee to grow its crops.  Dependent on weather and growing conditions, USSC produces over 8 million tons of sugarcane each year, providing approximately 10 percent of all sugar produced in America.  USSC is one of Florida's major producers of sugar, oranges and orange juice products, providing 250 million glasses of premium orange juice each year, making it one of the largest suppliers of orange juice nationwide. Sugar produced by USSC is used by food manufacturers in the United States to make bread, canned fruits and vegetables, juices, beverages, and ice cream, to name a few.

16.   Like other farmers in Florida, USSC must water its crops. To do this, USSC must obtain permits authorizing its use of water which are issued only after the issuing agency – the South Florida Water Management District ("SFWMD") – is satisfied that use of such water is reasonable-beneficial, does not interfere with the rights of any existing legal users, and is in the public interest.

17.     Droughts and antecedent low Lake level conditions adversely affect USSC's ability to deliver water to its crops.  For example, when the Lake is at low levels, below 10.5 feet, USSC must rely on the SFWMD to deliver water from the Lake through the SFWMD's voluntary installation of portable forward pumps, because the normal gravity-driven deliveries are no longer sufficient. When relying on these portable forward pumps, water deliveries to USSC crops are limited and at some point, even these pumps will no longer be capable of delivering water.

18.     At these extreme low Lake levels, permanent environmental damage is risked through soil loss and uncontrollable wildfires. Under drought conditions, soil and organic matter oxidizes resulting in soil subsidence.  The threat of wildfire is usually managed through available Lake water as the means to extinguish a fire.  However, with low Lake levels and the inability to deliver water to the farm fields, the threat of an uncontrolled wildfire on USSC's lands increases. These potential environmental harms affect USSC as a landowner and nearby landowners.

19.     Because of the Corps' wasteful release of freshwater, USSC has had difficulty delivering irrigation water to crops in the southern part of the EAA and in the vicinity of the L-8 canal.

20.     USSC is adversely affected and damaged by the Corps' failure to comply with the APA and NEPA in lowering Lake Okeechobee outside of the 2008 Regulation Schedule.

21.     USSC also has a procedural interest in the Corps complying with its legal obligations under NEPA and the APA and suffers injury when the Corps fails to do so. As a result, USSC has suffered an injury in fact.

22.     Defendant, Lieutenant General Todd T. Semonite, is the Commanding General and Chief of Engineers for the United States Army Corps of Engineers ("Commanding General" or "Chief"). Lieutenant General Todd T. Semonite is sued in his official capacity.

23.     Defendant, Colonel Andrew Kelly, is the Commanding District Engineer for the United States Army Corps of Engineers, Jacksonville District ("District Engineer") and is in charge of the United States Army Corps of Engineers, Jacksonville District ("Jacksonville District") office in Jacksonville, Florida and is designated to act for the Secretary of the Army. Colonel Andrew Kelly is sued in his official capacity.

24.     Defendant, the Corps, is a federal agency under the United States Department of Defense. The Corps carries out projects that provide coastal protection, flood protection, hydropower, navigable waters and ports, recreational opportunities, and water supply. The Jacksonville District is a civil works district in the Corps. The Jacksonville District manages projects associated with Lake Okeechobee and Everglades watersheds on behalf of the Corps.

## JURISDICTION AND VENUE

25.     This action arises under NEPA, 42 U.S.C. § 4321 *et seq.*, and the APA, 5 U.S.C. §§ 701-706.

26.     This Court has subject matter jurisdiction pursuant to 5 U.S.C. §§ 701-706 (APA judicial review provisions) to determine whether Defendants acted arbitrarily, capriciously, with an abuse of discretion, and otherwise not in accordance with law; 28 U.S.C. § 1331 (federal question) because this action arises under the laws of the United States; and 28 U.S.C. § 1361 (action in the nature of mandamus to compel an officer or employee of the United States or agency thereof to perform a duty owed to Plaintiff).

27.     Relief is appropriate pursuant to 28 U.S.C. § 2201 and 28 U.S.C. § 2202 (Declaratory Judgment Act); 5 U.S.C. § 701 et seq. (APA); and 42 U.S.C. 4321 (NEPA).

28.     Declaratory relief is appropriate under 5 U.S.C. § 706, and 28 U.S.C. §§ 2201(a) and 2202 because an actual controversy, within the meaning of the Declaratory Judgment Act, exists between Plaintiff and Defendants.

29.     Injunctive relief is appropriate under 5 U.S.C. § 706, 16 U.S.C. § 1540, and 28 U.S.C. § 2202.

30.     Venue lies in this judicial district by virtue of 16 U.S.C. § 1540(g)(3)(A) (allowing "any person" to commence a civil suit on his own behalf) and 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims set forth in this Complaint occurred within this judicial district, and Defendants, having authority over the actions or inactions alleged, are located in this judicial district.  The Corps maintains a district office in this judicial district. Finally, USSC's substantial farming operations occur in Palm Beach County, which lies within this judicial district.

31.     The federal government has waived sovereign immunity in this action pursuant to 16 U.S.C. § 1540(g) and 5 U.S.C. § 702.

32.     USSC has exhausted all administrative remedies available to it as required by the APA and Declaratory Judgment Act.

33.     All conditions precedent, if any, have been satisfied, waived, or are futile.

34.     The Corps' decision and action in routine and ongoing releases of water to lower the water level of Lake Okeechobee is a final agency action reviewable under the APA.

### STATUTORY AND REGULATORY FRAMEWORK

#### Administrative Procedure Act

35.     Judicial review of federal agency action is governed by the APA, 5 U.S.C. §§ 701-706 *et seq.* The APA confers a right of judicial review on any person that is adversely affected by agency action. 5 U.S.C. § 702.

36.     Under the APA, the reviewing court "shall … hold unlawful and set aside agency action, findings, or conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A) and (D).

37.     When the action of a federal agency, here, the Corps, is the consummation of that agency's decision-making process and determines rights or obligations, the action is challengeable under the APA.

### National Environmental Policy Act

38.     NEPA is a procedural statute that does not dictate an outcome but requires federal agencies, like the Corps, to analyze and examine the environmental impacts of its actions by identifying and fully evaluating all environmental, social and economic effects of a proposed action.

39.     The purpose of NEPA is "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation; and to establish a Council on Environmental Quality." 42 U.S.C. § 4321.

40. Congress created the Council on Environmental Quality ("CEQ") to implement NEPA and promulgate regulations applicable to federal agencies to assist federal agencies in complying with NEPA. 42 U.S.C. § 4342; 40 C.F.R. § 1500 *et. seq.*

41. Under NEPA, a federal agency must undertake and complete a new EIS prior to taking any major federal action and must undertake a supplemental EIS where: (i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

42. The Corps' decision to routinely and on a continuous basis drain water from the Lake is a major federal action requiring a new EIS or a supplemental EIS, particularly where new circumstances and information concerning the Lake and operational effects have arisen since the now outdated data reviewed in the 2007 EIS.

43. Under the Corps' civil works NEPA regulations, the Corps is required to prepare an EIS when the Corps proposes major changes in the operation and/or maintenance of completed projects. The Corps' actions here constitute a major change in the operation or maintenance of the Lake because the Corps is releasing water from the Lake when the 2008 Regulation Schedule requires that the Corps retain water in the Lake for conservation.

44. These regulations help ensure that the Corps complies with NEPA.

45. Under NEPA and CEQ regulations, in undertaking an EIS, the Corps would be required to thoroughly examine the direct, indirect, and cumulative environmental and social impacts, and explore and evaluate a range of reasonable alternatives that meet the basic purpose of the federal agency's action. Here, by failing to undertake a new EIS or supplemental EIS the Corps failed to conduct this necessary due diligence.

10

46.     NEPA requires the Corps to comply with its procedures in good faith and to fully and fairly analyze all of the effects of the proposed action and the alternatives to a proposed action which may avoid or minimize the adverse effects. Here, the Corps failed to do this. Instead, in violation of its obligations under NEPA, the APA and CEQ regulations, the Corps announced its decision to release from the Lake unprecedented amounts of water on an ongoing basis without public input, without discussion of alternatives and with, at most, a cursory review of the effects of its action.

47.     NEPA requires the Corps to take a "hard look" at the environmental effects of its actions, even after an original EIS has received initial approval.  Although the 2008 Regulation Schedule received initial approval, the Corps is required but has failed to take a "hard look" at its 2018 and 2019 actions that are inconsistent with the 2008 Regulation Schedule.

48.     In the 2007 EIS, the Corps did not take a "hard look" at the effect of ongoing releases of water at low Lake levels during the dry season. Therefore, the Corps' cannot rely on the 2007 EIS or 2008 Regulation Schedule for this purpose, particularly where so doing ignores a decade of additional data.

**BACKGROUND FACTS**

**A. The Corps Has Aggressively Lowered Lake Okeechobee Beyond its 2008 Regulation Schedule Due to Political Pressure in Violation of NEPA and the APA.**

49.     The Corps controls the gates and structures that release water from the Lake along the east to the St. Lucie River, and to the west into the Caloosahatchee River. The Corps may also release water to the south to the Everglades Agricultural Area ("EAA"), towards the Everglades and towards the lower east coast for use by urban water supply users in Miami-Dade,

Broward and Palm Beach Counties.   Attached as **Exhibit C** is map depicting the Lake and these outflow points.

50.     At low Lake levels (below 13 feet, depending on the time of year), the 2008 Regulation Schedule instructs the Corps to hold water in the Lake for conservation purposes, allowing only limited releases under very specific circumstances. In violation of the 2008 Regulation Schedule, the Corps released water from the Lake when it should have been conserving the water.

51.     Releasing Lake water unnecessarily wastes South Florida's water resources by draining the Lake, without proper authority, at a time when conserving water is not only prudent, but mandated by the 2008 Regulation Schedule.   The Corps' actions are squandering freshwater to tide with an already low Lake and essentially risking a "Corps-induced" or "man-made" drought.

52.     Droughts are dangerous to people and the environment.   The Lake is the key to providing for South Florida's water needs.

53.     The Corps, under the direction of the 2008 Regulation Schedule, is obligated to manage the Lake to provide some resiliency against natural droughts.  By failing to manage the Lake through, among other actions, wasteful draining of the Lake, the Corps has violated the 2008 Regulation Schedule and jeopardized the resiliency and impacts water supply interests for millions in South Florida including agricultural, recreational, navigational and urban stakeholders in South Florida.  This waste of water harmed and continues to harm public health and safety by impeding navigation in the Lake and adversely affecting fishing and nesting birds in the Lake and throughout South Florida and has increased the risk of dangerous and uncontrollable peat fires south of Lake Okeechobee.  Urban water supply is also at risk because

12

the supply source of thousands of water users in South Florida can become contaminated with salt water when there is a lack of Lake water to recharge these drinking water sources.

54.     At a minimum, before opening up the proverbial, and literal, "gates" to release this water, the Corps was required to have fully analyzed the effects of its release decisions so that the Corps and all of South Florida could understand the expected impacts.  This did not occur – the law mandates that it should have.

55.      When the Corps adopted the 2008 Regulation Schedule, it prepared the 2007 EIS. See Lake Okeechobee Regulation Schedule, Final Supplemental Environmental Impact Statement Including Appendices A through G, November 2007 (referred to herein as the "2007 EIS"). An EIS is required by law for any federal "major" agency action that can "significantly affect the human environment".  Managing lake levels in the Lake is a major federal action that significantly affects the human environment. NEPA applies to federal actions that are not ministerial or non-discretionary.

56.     The 2007 EIS considered only three years of effects on the large number of urban, agricultural, navigational, Tribal, governmental, and environmental stakeholders affected, and the potential effects to water resources, and threatened and endangered species and wildlife resources, all with some stake or interest in the Lake. The 2008 Regulation Schedule has been in place for approximately twelve years.

57.     The Corps' current water releases, beyond the levels mandated in the 2008 Regulation Schedule, are a major federal action for which an EIS is needed.  Both the context – affecting millions of South Floridians' water supply - and the intensity – dumping huge amounts of water from the Lake – warrant a "hard look" at their effects.

58.     Due to the length of time that has passed since the original 2007 EIS and the Corps' changed operations, a new EIS for the Lake is needed to properly assess the effects of the Corps' operations on the human environment.

59.     Hurricane Irma in 2017 and the rainfall events in the summers of 2016 and 2018 were extreme weather events resulting in high volume harmful discharges to the estuaries. These discharges were consistent with the 2008 Regulation Schedule.

60.     After such discharges, several environmental groups and Congressman Brian Mast, have publicly urged the Corps to lower Lake Okeechobee to 10.5 feet (much lower than the desired 12.5 to 15.5 foot ecological envelope) in the dry season.

61.     In bowing to this political pressure, the Corps in November 2018 began an extreme and long-term operation dramatically lowering Lake Okeechobee water levels by wasting freshwater resources and discharging to estuaries under so-called additional operational flexibility. The Corps did not provide the public with any public notice or comment period, nor did it provide a range of alternatives it analyzed, nor did it provide what the expected outcome or Lake level would be.

62.     The Corps' action to lower the Lake is final agency action subject to APA review. Here, the Corps' actions are the culmination of the Corps decision-making and adversely impact USSC's rights and obligations.

63.     The Corps documented the consummation of its decision-making process in its MFRs.  The decision to wastefully discharge water outside of the 2008 Regulation Schedule makes it no longer physically available for permitted, legal users and threatens users' ability to protect themselves from harmful environmental effects, including, but not limited to, soil loss, wildfires and saltwater intrusion.

64.     The Corps' water discharges from the Lake are not authorized in the 2008 Regulation Schedule.

65.     No modeling or an analysis of the effects of these extreme dry season discharges was done. See Section 7-16 of the Water Control Plan for Lake Okeechobee and Everglades Agricultural Area, dated March 2008.  Therefore, the investigation of the effects that is required by NEPA has not been done.

66.     In 2007, the U.S. Fish and Wildlife Service also raised concerns about the Corps' undertaking these open-ended, unstudied water discharges in its Fish and Wildlife Coordination Act Report for the 2008 Regulation Schedule.

67.     For over seven months, the Corps operated the Lake discharging water when the 2008 Regulation Schedule and the analysis in the 2007 EIS state that water should have been conserved in the Lake.

68.     Since November 2018, Corps' discharges have been responsible for lowering the Lake elevation by a foot more than the 2008 Regulation Schedule otherwise provided.  This amount is equivalent to almost 400,000 acre-feet, and is more water than is contained in any of the reservoirs used or planned for Everglades restoration.

69.     The Corps attempted to apply NEPA to its decision to use additional operational flexibility in an MFR, with the subject, "Lake Okeechobee Regulation Schedule Additional Operational Flexibility Justification and National Environmental Policy Act Coverage Determination" ("October MFR"). The October MFR, the 2018 Operational Strategy, and the Water Control Plan for Lake Okeechobee and Everglades Agricultural Area, dated March 2008 are attached as Composite **Exhibit D**. This decision began what has now turned into months of

operations outside of the 2008 Regulation Schedule, driving the Lake level down without study or a clear end goal.

70.    The October MFR stated that releases would stop when cumulative releases were over 164,600 acre-feet over the normal 2008 Regulation Schedule Part D.  But once the Corps hit that cumulative release level, instead of stopping making releases, the Corps in a piecemeal decision, decided to continue operating outside of the 2008 Regulation Schedule, as documented in the February 2019 MFR. On February 22, 2019, the Corps issued its decision to continue using additional operational flexibility in an MFR with the subject, "Lake Okeechobee Regulation Schedule Additional Operational Flexibility Justification and National Environmental Policy Act Coverage Determination" ("February MFR").   The February MFR and 2019 Operational Strategy are attached as Composite **Exhibit E**. This time there was no such release calculation to place an end goal on the current operations.

71.    In its self-serving, conclusory MFRs, the Corps decided without any public input that it had NEPA "coverage."  Admitting these actions needed to comply with NEPA, the Corps attempted to declare it had "coverage" under the almost 12-year old 2007 EIS.  This conclusion flouts the law by ignoring the changes in operations and the changes in circumstances that have occurred since the 2007 EIS was prepared more than a decade ago.

72.    The way the Corps has been using additional operational flexibility since 2018 is far beyond the expectations that it would be infrequent.  Indeed, it has lasted over seven months, the effects of its actions have never been studied, not even in the old 2007 EIS.  These water releases amount to the Corps self-selecting a new alternative Lake schedule, without public input or scientific analysis.

73.     The Lake is nearly four feet lower than it was when the October MFR was issued, wasting freshwater resources without analyzing the risk or engaging public stakeholders.

   **B.  The Corps' Unanalyzed, Extreme Actions Have Had Significant Adverse Effects on the Quality of the Human Environment Requiring an EIS**

74.     The current Lake stage of 11.65 feet is low for this time of year, and below the Lake's ideal water levels, which varies seasonally from 12.5 – 15.5 feet.  The Corps' action to purposefully draw down the Lake more than a foot below the desired level and release almost 400,000 acre-feet of freshwater constitutes a "major federal action" significantly affecting the quality of the human environment, for which an EIS was needed.

75.     Prior to reaching the current Lake stage of 11.65, the Lake stage had entered a part of the 2008 Regulation Schedule, called the Beneficial Use Band, which required the Corps to conserve water in the Lake and limit discharges, which the Corps did not do.  As a result, the Lake stage has entered the Water Shortage Band.  If rainfall falls short, the entire south Florida region will be condemned to catastrophic, harmful impacts from the Corps' man-made and unauthorized drought.

76.     The Corps has not examined whether lowering Lake Okeechobee below levels provided for in 2008 Regulation Schedule will have a significant impact on the quality of the human environment as it is required to do. The MFRs referenced above did not undertake the in-depth analysis.

77.     NEPA requires analysis of both context and intensity of an action in determining whether it "significantly" affects the quality of the human environment.

78.     The Corps' actions of draining the Lake beyond the 2008 Regulation Schedule gives rise to both elements of context and intensity, based on the enormous impact the Lake has

17

on the south Florida environment and economy and the intensity of the effects of the Corps' decisions impacting the environment.

79.     In violation of NEPA, the Corps has not analyzed both context and intensity of its actions in draining the Lake beyond the 2008 Regulation Schedule.

80.     Lake Okeechobee water levels affect the five counties that border the Lake, as well as all the areas in south and central Florida affected by the Central and Southern Florida Project (C&SF Project). Lake levels have both short and long term effects on the environment and economy, including low Lake level impacts to water supply for millions of Floridians, water supply for permitted users, fishing, ecotourism, and navigation on the Lake. Lasting effects from the increased risk of saltwater intrusion from lack of water to recharge aquifers and risk of peat fires in both the EAA and the natural parts of the system may occur at such low Lake levels.

81.     NEPA requires the Corps to consider the impacts of the draining of the Lake, both beneficial and adverse.  The Corps has violated NEPA by failing to do so, particularly where the Corps has not adequately considered potential for permanent adverse impacts from saltwater intrusion, peat loss and fires.

82.     Purposefully draining the Lake in the dry season has devastating impacts on public health and safety, for example, the low Lake has already adversely impacted navigation on the Lake to the point of  putting boaters' safety and lives at risk from running aground.  Public water supply is also at risk from wasting available recharge water.

83.     Impacts to the area are magnified by the unique characteristics of geographic area, particularly, given the large scale of the Lake, lowering it even a few inches, just for the sake of lowering the Lake, means wasting vast quantities of freshwater that are needed to sustain water users and the ecology of the Lake.

84.     The effects of Corps' actions are highly controversial.  Those pushing for a lower Lake in the dry season believe it will help stop discharges to the estuaries.  In fact, the opposite is true, the Corps driving the Lake into the water shortage band results in more discharges than called for in the 2008 Regulation Schedule. Each time the Corps revises the Lake schedule, hundreds or even thousands of comments are received from the public, with input on the effects of Lake operations. Taking extreme action to drain the Lake in the dry season is highly controversial because despite assurances that rain will come, the weather is uncertain, and the Corps is risking permanent, harmful environmental effects.

85.     Uncertainty in weather prediction generates enormous risk to the environmental resources.  In essence, the Corps is relying on a wet rainy season to raise Lake levels back up, after its extreme lowering of the Lake.  The Corps has failed to analyze the effects of its actions if the rainy season is not as wet as it hopes.

86.     The Corps' operations outside the 2008 Regulation Schedule without a new EIS sets an alarming precedent that the Corps can supplant the 2008 Regulation Schedule and replace it with a new alternative that the Corps formulated on its own, without robust analysis and public input through an EIS.

87.     The October MFR led the public to believe there was an end point to the Corps' actions, once it cumulatively released 164,600 acre-feet of water.  However, immediately after reaching this amount of water, the Corps issued the February MFR, continuing the operations, having an open ended, unstudied, significant effect.

88.     The Corps has not assessed the effects on cultural and historic resources.

89.     The Corps has also not assessed impacts to endangered and threatened species. There has been virtually no endangered snail kite nesting on the Lake in 2019 – showing the

adverse species impact that the Corps purposefully driving the Lake lower has resulted in dramatically increased risk of water shortage and associated adverse consequences. A new EIS and consultation with the U.S. Fish and Wildlife Service on these Lake lowering actions is required prior to making this discharges and lowering the Lake into the Water Shortage Band.

90.     The Corps' actions threaten a purposeful violation of state environmental protection law, particularly those laws in Chapter 373, Florida Statutes for protecting water resources.  The Corps' actions driving the Lake are so extreme, they risk water shortage and violating state law by triggering a Lake Okeechobee Minimum Flows and Levels (MFL) violation by driving Lake levels below 11 feet for more than 80 days.

91.     Together, the context and intensity of these effects are significant and must be properly studied through an EIS.

**C. The 2008 Regulation Schedule's 2007 EIS Is Based on Outdated and Inapplicable Information and the Corps' Has New Data It Must Consider and Analyze for Lake Okeechobee Operations**

92.     When studied in the 2007 EIS, all the analysis was premised on the schedule being only a temporary, interim schedule that would last three years while the Herbert Hoover Dike surrounding the Lake was being repaired.

93.     In 2008, the effects of lowering the Lake by more than 1 foot from the previous permanent regulation schedule (known as Water Supply and Environment ("WSE")) and the compromises made to project purposes like water supply and navigation were only studied as to the interim three year period.

94.     As of the date of this filing, more than a decade after the 2008 Regulation Schedule became effective and seven years past its originally-stated lifespan, the 2008

Regulation Schedule remains in effect (notwithstanding the Corps' current actions at issue here). The Corps now says it plans to leave the 2008 Regulation Schedule in effect through 2022.

95.     The study done in the 2007 EIS is now outdated and premised on facts as to the duration that are no longer true.   In 2015, the U.S. Fish and Wildlife Service reinitiated consultation on endangered and threatened species because it stated its biological opinion supporting the 2008 Regulation Schedule was based on old analysis, and changed circumstances warranted reinitiation.

96.     None of the other effects of the action were updated based on the changed circumstances. The Corps has not studied the long-term effects of the lower 2008 Regulation Schedule on the quality of the human environment.   For example, enormous amounts of in-Lake storage have been lost for an additional seven years on top of the short-term, three year studied duration.   In the long term, the risk of drought has increased from these low Lake operations.

97.     In the last 12 years, the Corps has gathered new data on the effects of Lake operations in the south Florida environment.   For example, the Corps analyzes the environmental risks from climate change and the predicted more extreme weather events. *See for example*, ECB 2016-25, Guidance for Incorporating Climate Change Impacts to Inland Hydrology in Civil Works      Studies,      Designs      and      Projects,      *available      at*: https://www.iwr.usace.army.mil/Portals/70/docs/Climate%20Change/ecb_2016_25.pdf.      The Corps' own files indicate that more people than ever rely on the Lake for fresh drinking water and agricultural water supply, yet the Corps failed to analyze new information in making its decision to aggressively lower the Lake.

98.     In the 12 years since the 2007 EIS was completed, the Corps has developed additional science as to risks from saltwater intrusion, climate change, more extreme drought and

rainfall events predicted. Saltwater intrusion and wildfires are a consequence of extreme droughts. The Corps, however, has wrongly failed to incorporate this science into its decision making. The Corps is currently engaged in a Section 216 Restudy of the C&SF Project to address climate change.

## CLAIM FOR RELIEF
### (The Corps' Violations of NEPA and APA)

99.     USSC reincorporates and re-alleges Paragraphs 1 through 98, as though fully set forth herein.

100.     The Corps violated the APA and NEPA and its implementing regulations.

101.     The Corps' decisions (documented in the October MFR and February MFR) to use additional operational flexibility to drain Lake Okeechobee below the water level called for in the 2008 Regulation Schedule and the Corps' current operations of the Lake constitute final agency action for which there is no other adequate remedy in a court. 5 U.S.C. § 704.

102.     The Corps' decision to operate Lake Okeechobee outside of the 2008 Regulation Schedule is a major federal action within the meaning of NEPA and the CEQ regulations.

103.     The Corps' decision to drastically lower Lake Okeechobee significantly affects the quality of the human environment by limiting the amount of water available to farmers, local governments and their residents, and businesses that rely on water from the Lake, which is nearly all of South Florida's six million people. It further has immense effects that are controversial, uncertain and affect threatened and endangered species, and public health and safety.

104.     As a result, the Corps was required to prepare an EIS (or supplemental EIS) pursuant to NEPA and the CEQ regulations to analyze the direct, indirect, and cumulative impacts of its action, and consider alternatives to the proposed action.

105.    NEPA requires agencies to provide a supplemental EIS whenever "(i) the agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1). In determining whether a change is "significant," an agency must consider both context and intensity, 40 C.F.R. § 1508.27.

106.    The Corps has failed to adequately consider the direct, indirect, and cumulative social, environmental and economic impacts of its declared action to lower Lake Okeechobee further below the water level that was provided for in the 2008 Regulation Schedule. Furthermore, the Corps has failed to consider alternatives to its proposed action.

107.    The Corps is implementing changes to the proposed action that have not been analyzed and circumstances have changed since the 2007 EIS, such that a new EIS is necessary.

108.    The Corps' decision to lower the Lake without conducting the required analysis under NEPA and its decision to not issue an EIS or a supplemental EIS are arbitrary, capricious, an abuse of discretion, and not otherwise in accordance with the law.

109.    A present and actual controversy exists between USSC and Defendants with respect to the rights, status and relations of the parties, and the dispute gives rise to a *bona fide*, actual, present, and practical need for a declaration of rights.

110.    USSC has suffered an invasion of a judicially cognizable interest, which is concrete and particularized and actual or imminent, not conjectural or hypothetical. And, the injuries will continue to occur unless this Court grants the requested relief.

111.    USSC has suffered an injury in fact resulting from the arbitrary and capricious Corps' decisions to lower Lake Okeechobee below normal operations in the 2008 Regulation

Schedule. USSC has suffered an invasion of a judicially cognizable interest which is concrete and particularized and actual or imminent, not conjectural or hypothetical. Water from Lake Okeechobee is critically necessary to USSC for crop irrigation and for preventing wildfires and soil loss.

112.    USSC faces an imminent decrease in the available water supply as a result of the low levels of Lake Okeechobee. USSC produces sugar cane and refined cane sugar and is one of Florida's major producers of oranges and orange juice products. The Lake is an essential water supply source for USSC's agricultural operations. The Corps' actions directly and significantly affect the water supply available for USSC's State permitted water use and to prevent environmental harm on USSC's lands.

113.    There is a causal connection between the injury and the conduct complained of. The injury is fairly traceable to the Corps' operation of the control structures regulating the water level of Lake Okeechobee. The Corps' action directly and significantly impacts the water that is physically available to water supply users and to prevent environmental harm.

114.    This injury likely will be redressed by a favorable decision in this action.

115.    The relief sought is not merely the giving of legal advice by the Court.

116.    The Corps' decision to wastefully drain Lake Okeechobee beyond the operations in the 2008 Regulation Schedule and its decision to not produce an EIS or supplemental EIS is arbitrary, capricious and an abuse of discretion and otherwise not in accordance with the law because the Corps failed to conduct the required statutory and regulatory analysis in violation of NEPA.

117.    USSC has a clear right to relief, and a substantial likelihood of success on the merits, because the Corps has violated NEPA by failing to prepare an EIS or supplemental EIS

for its actions to lower Lake Okeechobee further below the water levels called for in the 2008 Regulation Schedule.

118.    USSC further has a clear right to relief, and a substantial likelihood of success on the merits, because the Corps' failure to prepare an EIS analyzing the environmental impacts of its decision to lower Lake Okeechobee further below the water levels called for in the 2008 Regulation Schedule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment for the Plaintiff and provide the following relief:

a.      Declare that the Corps has violated NEPA by failing to prepare an EIS or supplemental EIS for its actions to lower Lake Okeechobee further below the water levels called for in the 2008 Regulation Schedule;

b.      Declare that the Corps' failure to prepare an EIS analyzing the environmental impacts of its decision to lower Lake Okeechobee further below the water levels called for in the 2008 Regulation Schedule was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA;

c.      Set aside the October MFR and February MFR as arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of the APA; and

d.      Enjoin Defendants from implementing additional operational flexibility to lower Lake Okeechobee below the water levels established in the 2008 Regulation Schedule.

e.      Award such other further relief as this Court deems just and proper under the circumstances.

Dated: August 1, 2019.                    Respectfully submitted,

                                          */s/ Rick J. Burgess*
                                          **RICK J. BURGESS**
                                          Florida Bar No. 347272
                                          GUNSTER, YOAKLEY & STEWART, P.A.
                                          Las Olas Centre
                                          450 East Las Olas Boulevard, Suite 1400
                                          Fort Lauderdale, FL  33301-4206
                                          rburgess@gunster.com
                                          Telephone:  954-468-1363
                                          Facsimile: 954-523-1722

                                          **GREGORY M. MUNSON**
                                          Florida Bar No.: 188344
                                          GUNSTER, YOAKLEY & STEWART, P.A.
                                          215 South Monroe Street, Suite 601
                                          Tallahassee, Florida 32301
                                          gmunson@gunster.com
                                          Telephone: (850) 521-1980
                                          Fax: (850) 576-0902

                                          *Attorneys for United States Sugar Corporation*